Lillian **WILSON**

v.

**UNITED STATES of America.**

Isaac **DENT, Jr., et al.**

v.

**UNITED STATES of America.**

**Civ. A. Nos. 92–455–A, 92–520–A.**

United States District Court,
M.D. Louisiana.

Jan. 13, 1995.

Edward J. Walters, Jr. and John Chandler Loupe, Moore, Walters, Shoenfelt & Thompson, Baton Rouge, LA, for Lillian Wilson.

Charest D. Thibaut, III, Thibaut, Thibaut, Bacon, Latchem & Vogt, LLP, Baton Rouge, LA, for Isaac Dent, Jr.

L.J. Hymel, U.S. Atty., MD La. and Lyman E. Thornton, III, Asst. U.S. Atty., Baton Rouge, LA, for the U.S.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

This matter has been submitted following the trial on the merits and the filing of post trial briefs. Having now had an opportunity to read the deposition of Dennis Guillaume, the court denies the government's motion for judgment as a matter of law, which was previously taken under submission. The court accordingly enters its findings of fact and conclusions of law, pursuant to Fed. R.Civ.P. 52(a).

### Findings of Fact

1. Plaintiffs, Lillian Wilson and Isaac Dent, Jr., bring this action to recover damages resulting from the tragic death of their seven year old son, Isaac Dent III.

2. Made defendant is the United States of America under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) in a claim of negligence of a postal carrier, James Richard Borg.

3. On the afternoon of June 25, 1991, Borg was delivering mail along Highway 67, also known as Plank Road, in East Baton Rouge Parish.

4. Plank Road is a four lane, heavily trafficked thoroughfare. A median divides the lanes. The posted speed limit in the area was 45 miles per hour.

5. Borg's delivery route was designated as a "mounted route." As such, he stayed in his vehicle to service mail boxes located adjacent to the shoulder of the road. In order to reach the mail boxes, it was necessary to drive the postal vehicle up on the shoulder.

6. Shortly before the accident, Borg delivered mail to 12155 Plank Road. His vehicle was on a blacktop surface approximately 11 feet wide running adjacent to the roadway.

7. According to Deputy Guillaume who assisted in investigating the accident, the blacktop area could be considered as a shoulder and a sidewalk, considering the amount of area covered with blacktop.

8. There was a low curb ("rollover curb") running between the roadway and the shoulder. Borg headed his vehicle southbound and started to ease on to the roadway. His next stop was 242 feet away, at 12109 Plank Road.

9. After straddling the curb a short distance, Borg observed in his rear view mirror that traffic was coming up behind him at a fast speed. Borg decided to get back entirely on the shoulder and did so.

10. Borg traveled along the shoulder for at least 100 feet and was approaching a closed fast food outlet, Sonic, with parking lot and driveway immediately in front of him.

11. Borg's vehicle was travelling at an approximate speed of fifteen miles per hour with the flashers on as he approached the entrance to the Sonic parking lot/driveway.

12. Isaac suddenly rode his bicycle out from behind a tall row of bushes and trees directly into the path of the postal vehicle.

13. Borg saw a blur coming from the right and braked his vehicle, veering to the left. There were nearly 18 feet of skid marks from Borg's right rear tire and 7 feet of skid marks from his left rear tire.

14. The front wheel of Isaac's bicycle made contact with the right front corner of the postal vehicle.

15. The evidence establishes that the hedge row or tree line was very dense and over six feet tall. The hedge row ran along the property line perpendicular to Plank Road, tapering down to the ground about three to four feet before it reached the shoulder/sidewalk. Borg testified that the foliage obscured his view, that he could not see past it.

16. From Borg's position, as he travelled on the shoulder, it was obvious that he would have only a fraction of a second to react to someone coming out from behind the hedge row. At 15 miles per hour, his vehicle was moving 22 feet every second.

17. From the pictures and diagrams, it appears that the driveway to the parking lot was only a few feet beyond the point of collision. The court finds that the hedge row totally obstructed Borg's view of anyone exiting the parking lot, whether by vehicle, foot or bicycle.

18. Borg was not required to travel on the shoulder of the roadway. There clearly was no emergency situation and the distance between his stops was more than 240 feet (some 80 yards).

19. Borg denied ever seeing children playing in the Sonic parking lot prior to the accident. However, Borg had been delivering mail along this route for approximately four years and knew that there were many businesses (including a small shopping center, two service stations, a K & B Drug Store and a McDonald's restaurant) as well as dwellings and apartment complexes in the immediate vicinity. Indeed, Borg admitted knowing that Isaac and other children lived in a residential area behind (west of) the Sonic restaurant.

20. Considering the presence of people in the area, Borg should have anticipated that someone, whether an adult or child, might walk or ride a bicycle out from behind the hedge row. Indeed even a motor vehicle might have come out, considering that there was a paved parking lot and driveway, although the store was no longer open. Borg should have anticipated that someone coming out from behind the hedge row would not expect to find vehicles travelling upon the shoulder, especially considering the proximity of the hedge row and the entrance to the parking lot.

21. From the testimony of Trooper Coburn, the drawings of the accident scene and photograph, joint exhibit 5C, the court finds that Isaac was riding his bicycle near the northern edge of the parking lot towards Plank Road.

22. The evidence indicates that Isaac may have used a sectional curb located in the parking lot as a make-shift ramp. While the front tire of the bicycle may have been in the air when it collided with the postal vehicle, no evidence was presented which established the speed of the bicycle. The court finds it more likely that Isaac was travelling at a moderate speed on his back tire rather than speeding through the air at a fast clip.

23. Isaac suffered severe injuries and died shortly after the accident.

24. The court finds from the evidence presented at trial that Isaac was a very happy, normal seven year old boy and that he had a good relationship with both of his parents. He was obviously much closer to his mother, his parents having separated when Isaac was about three years old.

25. His father is and was employed as a long distance truck driver which limited the amount of time he was able to spend with Isaac, but there was, nevertheless a close father-son relationship. The father's financial support of the child was sporadic and minimal but there was some support.

## Conclusions of Law

1. The court has subject matter jurisdiction over the claims asserted by plaintiff

pursuant to the Federal Tort Claim Act, 28 U.S.C. § 1346(b).

2. An action under the Federal Tort Claims Act is governed by the law of the state where the tort occurred. 28 U.S.C. § 1346(b).

3. The Louisiana courts have found that a motorist who sees a child near the roadway must exercise a high degree of care because a child is likely to be inattentive and might suddenly place himself in a position of peril. *Dufrene v. Dixie Auto Insurance Company,* 373 So.2d 162 (La.1979).

4. However, when a motorist neither knows or has reason to know of the child's presence, the motorist simply has a duty to use ordinary care. *Jeansonne v. Corbett,* 496 So.2d 1346 (La.App. 3rd Cir.1986), writ denied, 499 So.2d 942 (La.1987). Under the jurisprudence, a motorist proceeding at a lawful, reasonable speed on the roadway and maintaining a proper lookout, is not liable when a child unexpectedly darts into his path from a concealed position. *Jeansonne,* supra, citing cases.

5. In this case, Borg did not see Isaac and would not be at fault if Isaac had suddenly darted out into the roadway. However, that is not what happened. The evidence shows that Borg was travelling upon the "shoulder", which by definition is not intended for travelling vehicles but for accommodation of stopped vehicles and emergency use. La.R.S. 32:1(65). The "roadway," which is intended for vehicular traffic, by definition excludes the "shoulder". La.R.S. 32:1(59).

6. Thus, while there is apparently no specific Louisiana penal regulation which makes it a traffic offense to travel upon the shoulder in a motor vehicle, it is beyond dispute that motoring down the shoulder of a roadway is not a safe driving practice. Additionally, not considering La.R.S. 32:296 [1] which is inapplicable here, it is undisputed that postal employees are not exempted from the traffic regulations.

7. So long as Borg kept his vehicle on the roadway, he had the right of way over vehicles entering Plank Road from private driveways. La.R.S. 32:124. But when he departed the roadway and entered the shoulder, he left the right of way behind. There are no traffic regulations governing right of way on the shoulder when one is using a shoulder for travel for a motor vehicle.

8. Borg had been on this same route for four years and knew, or should have known, that this was a mixed residential and commercial area with many people out and about. While Borg may have never encountered children playing in the parking lot of the closed fast food outlet, he admittedly knew that children, including Isaac, lived and played in the vicinity.

9. From his position on the shoulder, Borg knew that he could not see whoever or whatever might be on the other side of the hedge row. It should have been apparent that at 22 feet per second, he would have little time to react to whatever might emerge from the other side of the hedge row.

10. Additionally, Borg should have realized that someone on the other side could not see him. He is charged with awareness of the fact that his moving vehicle was in an area where moving vehicles are not normally found.

11. For all practical purposes, Borg was approaching a "blind corner." Although, as noted, supra, this was not an intersection of roadways, it was surely a blind spot on a route chosen by the driver. Under Louisiana law applicable to roadways, "When a driver encounters a 'blind' corner, he must drive to a point where he can gain a better view before proceeding into the intersection." *Messex v. Louisiana Dept. of Highways,* 302 So.2d 40, 42 (La.App. 3rd Cir.1974).

12. This court concludes that a similar duty rested upon Borg here—the driver of the postal vehicle should have slowed or stopped his vehicle until he could gain a better view past the hedge row before proceeding.

---

1. Under section 296, one may "park, stop, or leave standing any unattended vehicle on any state highway shoulder" if it is a public vehicle and one is engaged in the conduct of official business.

13. Considering all these factors, the court concludes that Borg had the duty to exercise a very high degree of care while travelling on the shoulder. The court further concludes that the accident would not have happened if Borg had been exercising such a high degree of care.

 14. The comparative fault of a child is not measured by adult standards but by the self-care expected of a child of the same age, intelligence and experience under the particular circumstances. *Howard v. Allstate Ins. Co.,* 520 So.2d 715 (La.1988).

15. From the evidence, it appears that Isaac was a very active, normal seven year old boy. Considering his age and experiences and the circumstances outlined above, the court finds no merit to the government's claims that Isaac was negligent.[2]

16. A parent may be held comparatively negligent for failing to use reasonable precautions in supervising a child. A mother is required to use reasonable precautions such that a reasonably prudent person would take faced with similar conditions and circumstances. See, *McFarland v. Industrial Helicopters, Inc.,* 502 So.2d 593 (La.App. 3d Cir.1987).

17. The court finds no merit to the government's claim that Lillian Wilson was negligent in failing to use reasonable precautions in supervising Isaac's activities on the day of the accident. The government's proof on this point falls far short and amounts to mere innuendo.

18. Isaac lived with his mother and they had a close, loving relationship. The court finds that plaintiff, Lillian Wilson, is entitled to $175,000 in compensation for the loss of her son.

19. While Isaac did not live with his father at the time of his death, the two had continued to see each other. The father continued to take an interest in his son's happiness and well being. The court finds that they had a caring father-son relationship

and that Isaac Dent, Jr. is entitled to $100,000 for the loss of his son.

20. Plaintiffs are also entitled to recover $1299.08 in funeral costs and $795 in burial expenses. It being unclear which plaintiff paid these expenses, they will be awarded to plaintiffs in solido.

Judgment will be entered in favor of plaintiff, Lillian Wilson, in the amount of $175,000 and in favor of Isaac Dent, Jr., in the amount of $100,000 and in favor of plaintiffs in solido in the amount of $2094.08.

---

**2.** Pre-comparative fault cases indicate that a seven year old is incapable of contributory negligence absent a showing of extraordinary conditions. *Jackson v. Jones,* 224 La. 403, 69 So.2d 729 (La.1953). The court need not decide whether this rule is still applicable as the government failed to prove that Isaac was negligent in any event.